UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TROY BACKUS,

                    Plaintiff,

        v.

GENERAL MILLS, INC., et al.,

                    Defendants.

Case No. 15-cv-01964-TEH

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTION TO STAY CASE**

        This matter came before the Court on August 17, 2015 for a hearing on Defendants General Mills, Inc.'s and General Mills Sales, Inc.'s (collectively "General Mills'") motions to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim (Docket No. 8) and to dismiss or stay the case under the primary jurisdiction doctrine (Docket No. 22).[1]  After carefully considering the arguments of the parties at the hearing and in the papers submitted, the Court hereby GRANTS IN PART and DENIES IN PART General Mills' motion to dismiss, and GRANTS General Mills' motion to stay the case under the primary jurisdiction doctrine, for the reasons set forth below.

**BACKGROUND**

        Plaintiff Troy Backus ("Backus") brings this putative class action to challenge Defendant General Mills' practice of selling baking mixes that include trans fats in the form of partially hydrogenated vegetable oils ("PHOs").  Compl. ¶ 7 (Docket No. 1). Backus alleges that "Defendants manufacture, distribute, and sell a variety of baking mix products (collectively "the Trans Baking Mixes" or "TF Baking Mixes") containing partially hydrogenated oil . . . ."  *Id.* ¶ 4.  He alleges that he purchased General Mills

---

[1] The two motions are respectively referred to herein as the Rule 12 Motion and the Primary Jurisdiction Motion.

United States District Court
Northern District of California

baking mixes "approximately 20 times a year over the past four years" and that he "repeatedly purchased and consumed" the mixes since 2008. *Id.* ¶¶ 5, 62, 83. The presence of partially hydrogenated oils is indicated on the ingredient list of various General Mills baking mixes. Ex. A to Request for Judicial Notice (Docket No. 9-1).[2]

Backus cites dozens of medical publications in his Complaint, and alleges that "There is 'no safe level' of artificial trans fat intake," and that "Artificial trans fat damages vital organs, including the heart, by causing chronic systemic inflammation, where the immune system becomes persistently overactive, damages cells, and causes organ dysfunction." Compl. ¶¶ 11-60. He alleges that "Plaintiff suffered physical injury when he repeatedly consumed Defendants' Trans Fat Baking Mixes, because consuming artificial trans fat in any quantity inflames and damages vital organs . . . ." *Id.* ¶ 78.

Backus also repeatedly alleges that *any* consumption of trans fats increases the risk of contracting various diseases. *E.g.*, *id.* ¶ 17 ("any incremental increase in trans fatty acid intake increases the risk of [coronary heart disease]."); *id.* ¶ 34 ("Eating trans fats increases your risk of developing heart disease."); *id.* ¶ 78 ("consuming artificial trans fat in any quantity . . . increases the risk of heart disease, diabetes, cancer, and death.").

Backus alleges that "there are safe, low-cost, and commercially acceptable alternatives to artificial trans fat, including those used in competing brands," but "Defendants unfairly elect *not* to use those substitutes in the Trans Fat Baking Mixes in order to increase profit." *Id.* ¶ 6. He alleges that he "lost money as a result of Defendants' conduct because he purchased products that were detrimental to his health and were unfairly offered for sale in violation of California law," because "[h]ad Defendants not violated the law, Plaintiff would not have been able to purchase the Trans Fat Baking Mixes." *Id.* ¶ 77.

Backus seeks to represent a class defined as "All persons who purchased in the United States, on or after January 1, 2008 (the "Class Period"), for household or personal

---

[2] The Court GRANTS General Mills' request for judicial notice of the baking mix label. *Brazil v. Dole Food Co., Inc.*, 935 F. Supp. 2d 947, 963 n.4 (N.D. Cal. 2013).

1    use, boxed baking mix products manufactured or distributed by Defendants containing

2    partially hydrogenated oil." *Id.* ¶ 83.

3         On November 8, 2013, the federal Food and Drug Administration ("FDA")

4    "tentatively determined" that PHOs are not "generally recognized as safe" ("GRAS"), a

5    term of art referring to a food product that can be sold without premarket approval.  78

6    Fed. Reg. 67169-01, 67170 (Nov. 8, 2013).  The FDA noted that PHOs had previously

7    been treated as GRAS by the food industry, although the FDA was not aware of any

8    formal sanction or approval of PHOs granted by either it or by the United States

9    Department of Agriculture ("USDA").  *Id.* at 67171.  The FDA requested comments from

10   the public on various questions, including whether the FDA should "finalize its tentative

11   determination that PHOs are no longer GRAS," whether there are "data to support other

12   possible approaches to addressing the use of PHOs in food, such as by setting a

13   specification for trans fat levels in food," and, should the FDA finalize its determination,

14   what compliance date would "be adequate for producers to reformulate any products as

15   necessary and that would minimize market disruption."  *Id.* at 67174.

16        On June 17 of this year, the FDA "made a final determination that there is no longer

17   a consensus among qualified experts that partially hydrogenated oils . . . are generally

18   recognized as safe (GRAS) for any use in human food."  80 Fed. Reg. 34650 (June 17,

19   2015).  The FDA set a date for compliance with its determination on June 18, 2018.  *Id.* at

20   34651.  The FDA "encourage[d] submission of scientific evidence as part of food additive

21   petitions" to determine whether PHOs could be used in small amounts, and set the

22   compliance date in 2018 "to allow time for such petitions and their review."  *Id.* at 34653.

23        The Grocery Manufacturers Association, an industry group of which General Mills

24   is a member, submitted a petition to the FDA to list PHOs as a food additive on June 11,

25   2015.  Ex. 4 to Sipos Decl. at 1 (Docket No. 26-1); *see also* General Mills' Civic

26

27

28

United States District Court
Northern District of California

3

Involvement Report, Calendar Year 2015, *available at* http://tinyurl.com/o3qvoy4 (indicating that General Mills is a member of the Grocery Manufacturers Association).[3]

## LEGAL STANDARD

### I.   Standing

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).  A party may raise this defense by filing a motion under Rule 12(b)(1).  "A party invoking federal jurisdiction has the burden of establishing that it has satisfied the 'case-or-controversy' requirement of Article III of the Constitution [and] standing is a 'core component' of that requirement." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "To satisfy Article III's case or controversy requirement, [a plaintiff] needs to show that he has suffered an injury in fact, that the injury is traceable to the challenged action of [the defendant], and that the injury can be redressed by a favorable decision." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004).  In ruling on a motion to dismiss for want of standing, the court must accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party. *Lema v. Courtyard Marriott Merced*, 873 F. Supp. 2d 1264, 1267 (E.D. Cal. 2012) (citing *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975)).

### II.   Motion to Dismiss

Rule 12(b)(6) requires a court to dismiss a complaint when a plaintiff's allegations fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  To

---

[3] The Court overrules Backus's evidentiary objection to the letter (Docket No. 28) and takes judicial notice of the fact that the Grocery Manufacturers Association has submitted a food petition request regarding PHOs to the FDA, because this fact can readily be determined from a source whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201; *see also* GMA Petitions FDA to Approve Low-Level Uses of Partially Hydrogenated Oils, *available at* http://www.gmaonline.org/news-events/newsroom/gma-petitions-fda-to-approve-low-level-uses-of-partially-hydrogenated-oils.

United States District Court
Northern District of California

survive a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausibility does not equate to probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In ruling on a motion to dismiss, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).  Courts are not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).

## III.   Primary Jurisdiction

"The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008).  The doctrine "is to be used only if a claim 'requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Id.* at 1114 (citation omitted).  The doctrine "is committed to the sound discretion of the court when 'protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.'" *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002) (citation omitted).  Courts consider the following non-exhaustive factors in deciding whether the doctrine of primary jurisdiction applies: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having

United States District Court
Northern District of California

regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Id*.

**DISCUSSION**

**I.    Backus Has Standing to Bring His Claims**

In its Rule 12 motion, General Mills first argues that the Complaint must be dismissed because Backus lacks standing to bring his claims. Specifically, General Mills argues that Backus has not pled a cognizable "injury in fact" that is sufficient for Article III standing in this case. Rule 12 Mot. at 7.

Backus argues that he has standing in this case in three ways: first, that consumption of trans fats caused inflammation in and other damage to his organs; second, that he suffered an economic injury in purchasing the products; and third, that consuming trans fats caused an increased risk of certain diseases. As discussed below, the first two injuries are sufficient for standing in this case, but his third argument fails.

**a.   Backus has standing because he alleges an immediate physical injury**

Backus's first theory of standing is that he has already suffered a physical injury from consuming trans fats in General Mills baking mixes. Rule 12 Opp'n at 5 (Docket No. 12). A physical injury is a traditionally recognized injury giving rise to Article III standing. *See Frissell v. Rizzo*, 597 F.2d 840, 845 (3d. Cir. 1979) ("The definitional problem is, of course, minimal when a plaintiff alleges a substantial past physical or financial injury of a traditional sort."), abrogated in part on other grounds as recognized by *Amato v. Wiletnz*, 952 F.2d 742, 750 n.8 (3d. Cir. 1991).

In order to confer standing, an injury must be "(a) 'concrete and particularized'; and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The injury may be minimal . . . 'an identifiable trifle' is sufficient to establish

6

standing." *Preminger*, 552 F.3d at 763 (quoting *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008)).

The Ninth Circuit has found allegations of physical injuries to be sufficient where the alleged injuries included "watering eyes and burning noses." *See Covington v. Jefferson Cnty.*, 358 F.3d 626, 638 (9th Cir. 2004). It must be noted, however, that in *Covington*, a case about exposure to pollution from a neighboring landfill, the complaint alleged several additional injuries which the court also found to be sufficient, including the risks of "fires, of excessive animals, insects and other scavengers attracted to uncovered garbage, and of groundwater contamination . . . [and] threats to the aesthetic and recreational enjoyment of their property . . . ." *Id.*

Here, Backus alleges that he purchased General Mills baking mixes "approximately 20 times a year over the past four years" and that he "repeatedly purchased and consumed" the mixes since 2008. Compl. ¶¶ 5, 62, 83. Citing medical publications, he alleges that "There is 'no safe level' of artificial trans fat intake," and that "Artificial trans fat damages vital organs, including the heart, by causing chronic systemic inflammation, where the immune system becomes persistently overactive, damages cells, and causes organ dysfunction." *Id.* ¶¶ 16, 60. He also alleges that "Plaintiff suffered physical injury when he repeatedly consumed Defendants' Trans Fat Baking Mixes, because consuming artificial trans fat in any quantity inflames and damages vital organs . . . ." *Id.* ¶ 78.

General Mills argues that these assertions are too speculative to confer standing. Rule 12 Mot. at 9. But, as quoted directly above, Backus alleges that he suffered a physical injury by consuming trans fats which inflame and damage vital organs in any amount. While Backus could have drafted his Complaint more clearly, for example by alleging that "Consuming the Trans Fat Baking Mixes inflamed and otherwise damaged Plaintiff's vital organs," that is the logical equivalent of what he actually did plead.

Accepting all material allegations as true and construing the Complaint in the light most favorable to Backus, his alleged physical injuries are sufficient to confer standing here. Although Backus's alleged organ inflammation may appear insignificant, courts

7

have repeatedly held that an identifiable trifle is sufficient to confer standing.  The inflammation of one's organs is identifiable, concrete, and actual.  General Mills' motion to dismiss for lack of standing is therefore DENIED.

**b.  Backus also has standing because he alleges a sufficient economic injury**

Backus also alleges that he suffered an economic injury by purchasing baking mixes that contained trans fats.  Rule 12 Opp'n at 8-9.  In addition to providing an alternative source of standing under Article III, Backus is required to plead an economic injury for his UCL claims, which can only be brought by "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code § 17204.  The injury of lost money or property that is required for a UCL claim is also sufficient for Article III standing.  *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010).

In *Kwikset Corporation v. Superior Court*, 51 Cal. 4th 310 (2011), the California Supreme Court explained that "[t]here are innumerable ways in which economic injury from unfair competition may be shown," including where "[a] plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have . . . ."  *Id.* at 323.  In *Kwikset*, a case about lock sets that were falsely labeled as "Made in the U.S.A.," the California Supreme Court found that the plaintiffs had sufficiently alleged an economic injury by alleging that they "would not have bought the product but for the misrepresentation," because "the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend."  *Id.* at 330.

Plausible allegations that a plaintiff purchased a defective or unsafe product are sufficient to make out an economic injury.  *In re Mattel, Inc., Toy Lead Paint Prods. Liability Litig.*, 588 F. Supp. 2d 1111, 1117 (C.D. Cal. 2008) (toys with lead paint); *see also Cole v. General Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) (airbags); *Keilholtz v. Lennox Hearth Products Inc.*, 268 F.R.D. 330, 336 (N.D. Cal. 2010) (fireplaces).  In *In re Mattel*, a case about toys with lead paint that were subject to recalls, the court held that

the plaintiffs "properly allege damages for the purchase price of the toys that allegedly were defective and not fit for their represented use. Plaintiffs' claim is straightforward— they allege that they purchased toys that were unsafe and unusable and should get their money back." 588 F. Supp. 2d at 1117. Rejecting the defendants' argument that the plaintiffs had not plausibly alleged that the products were defective, the court explained that, "Given the extensive allegations in the complaint concerning government-ordered safety recalls for all of the accused products, the Court finds ample pleading of the defectiveness of the toys." *Id.* n.8.

However, where the complaint does not plausibly allege that a product is unsafe, courts will find that its purchase did not constitute an economic injury. *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009) (headphones did not plausibly have defect creating inherent risk of ear injury). For example, in *Boysen v. Walgreen Co.*, No. 11-cv-6262 SI, 2012 WL 2953069 (N.D. Cal. July 19, 2012), the court considered a case about whether a distributor failed to adequately disclose the presence of lead and arsenic in its apple and grape juices. *Id.* at *1. The plaintiffs in that case alleged that they had suffered an economic injury, because if they had known that the products contained lead, they would not have purchased them. *Id.* at *4. The court found that this was not a sufficient economic injury, because the amount of lead in the products was within a range that the FDA had found to be safe, so the plaintiffs could not plausibly allege that they had spent money on an unsafe product. *Id.* at *5.

Similarly, in *Herrington v. Johnson & Johnson Consumer Companies, Inc.*, No. 09-cv-1597 CW, 2010 WL 3448531 (N.D. Cal. Sept. 1, 2010), a case involving allegedly carcinogenic baby bath products, the court found that the plaintiffs' allegation that the bath products were potentially carcinogenic was not sufficient to allege that they were defective or unfit for use, such that the plaintiffs had not received the benefit of their bargain. *Id.* at *4. The court noted that the "Plaintiffs do not allege that the levels of the substances in Defendants' products were unsafe," so they could not reasonably claim an economic injury from purchasing a dangerous product. *Id.* at *5.

United States District Court
Northern District of California

1    In *Simpson v. California Pizza Kitchen, Inc.*, 989 F. Supp. 2d 1015, 1022 (S.D. Cal.

2    2013), another case about trans fats, the court found that, even though the plaintiff had

3    alleged that she spent money on allegedly dangerous frozen pizzas, she consumed the food

4    and therefore received the benefit of her bargain.  989 F. Supp. 2d at 1022 ("Consumption

5    is the purpose for which one purchases frozen foods.  Thus, Plaintiff received the benefit

6    of her bargain from the purchase of the Contested Pizzas.").  The court in *Simpson* also

7    noted that the presence of trans fats in the pizzas was readily apparent from the label, so

8    the plaintiff could not claim that she was misled into purchasing the food.  *Id.* at 1022-23.

9    Here, Backus alleges that he repeatedly purchased General Mills baking mixes, as

10   much as 20 times per year for the last four years.  Compl. ¶ 62.  He alleges that he "lost

11   money as a result of Defendants' conduct because he purchased products that were

12   detrimental to his health and were unfairly offered for sale in violation of California law,"

13   because "[h]ad Defendants not violated the law, Plaintiff would not have been able to

14   purchase the Trans Fat Baking Mixes." *Id.* ¶ 77.

15   Backus has alleged a sufficient economic injury for standing under both Article III

16   and the UCL.  Unlike the plaintiffs in *Boysen* and *Herrington*, Backus has actually alleged

17   that the trans fat baking mixes at issue here caused him immediate physical injury, and

18   were unsafe because of the level of trans fat in them.  It is true that the presence of PHOs

19   was present on the products' labels, and apart from their trans fats, there are no allegations

20   that the baking mixes did not function properly.  However, Backus alleges that the sale of

21   the baking mixes is actually illegal, and that he would not have even been able to spend

22   money on them if General Mills had complied with California law.  The purchase of such

23   an allegedly unsafe and illegal product is sufficient to confer standing for an economic

24   injury under Article III and the UCL.

25   ///

26   ///

27   ///

28   ///

10

United States District Court
Northern District of California

**c.  Backus has not alleged a sufficient increased risk of future injury**

Even though Backus has sufficiently alleged that he suffered an actual physical injury and economic injury that gives him standing in this case, his allegations of an increased risk of future injury would not be sufficient if taken alone.

The Supreme Court has made clear that a plaintiff can only base standing on the risk of a future injury if such injury is "certainly impending." *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1147 (2013).  In *Clapper*, attorneys and human rights organizations argued that they had standing to challenge the federal government's warrantless wiretapping of phone calls to foreign parties, because there was an "objectively reasonable likelihood" that their phone calls would be intercepted.  *Id.*  The Supreme Court rejected that argument, and held that the probability of injury was too speculative to confer standing, since the plaintiffs' actual injury would require what the Court considered to be a "highly attenuated chain of possibilities," including the Government's decision to target foreign individuals with whom they communicate and the plaintiffs' participation on a call that actually gets intercepted.  *Id.* at 1148.  However, the Court recognized that its "cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about," and that, "[i]n some instances, [it has] found standing based on a 'substantial risk' that the harm will occur."  *Id.* at 1150 n.5.

Before *Clapper*, the Ninth Circuit used a lower standard to evaluate standing in cases involving a risk of future injury.  In *Covington*, a case about pollution from a landfill, the Ninth Circuit held that the standing inquiry depended on whether the defendants' actions caused "reasonable concern" of injury to the neighboring plaintiffs.  358 F.3d at 639.  And in *Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001), a case about pollution from real estate developments, the court held that "evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing."  *Id.* at 976; *see also Central Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002) ("a credible threat of harm is sufficient to constitute actual injury for standing purposes . . . .").  However, both of these

standards have been abrogated by *Clapper*'s "certainly impending" and "substantial risk" standards.

In increased risk of injury cases involving products liability, courts generally require a plaintiff to allege "(i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." *Herrington*, 2010 WL 3448531, at *3 (quoting *Public Citizen v. Nat'l Hwy. & Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007)). Although *Herrington* was a pre-*Clapper* case, its use of a "substantial probability" standard parallels *Clapper*'s "substantial risk" standard. In *Herrington*, a case involving allegedly carcinogenic baby bath products, the plaintiffs had pled that "scientists believe there is no safe level of exposure to a carcinogen," and that the bath products were "probable human carcinogens." 2010 WL 3448531, at *3. However, the court noted that "Plaintiffs do not allege that [the products] are in fact carcinogenic for humans. Nor do they plead that the amounts of the substances in Defendants' products have caused harm or create a credible or substantial risk of harm." *Id.* The court noted that the FDA had found that the same chemicals could be used safely in cosmetics products. *Id.* at n.2. Ultimately, the court found the alleged risk of harm to be "too speculative." *Id.* at *4.

In another trans fat case very similar to this one, where the plaintiff alleged that she had standing because of the increased risk of disease caused by consuming trans fats, the court rejected the argument and dismissed for lack of standing. *Simpson*, 989 F. Supp. 2d at 1022. Applying the two-pronged "substantial risk" test from *Herrington*, the court found that, "While Plaintiff does present significant evidence of the harmful effects of prolonged consumption of [trans fats], she does not allege facts tending to show that such isolated instances of [trans fat] consumption are sufficient to cause the enumerated harmful effects." *Id.* The court continued, "Thus, based on the allegations in the FAC, this Court is not convinced that consuming [trans fats] five times over the period of a year represents a substantial increased risk of harm, much less that the probability of that harm is

United States District Court
Northern District of California

1  substantial." *Id.* However, the court did not discuss any allegations of *present* physical

2  injuries in that case, but only an increased risk of *future* harm. *See id.*

3  Here, if the Court were to only consider Backus's allegations of future risk, he

4  would not have alleged a sufficient injury to confer standing. Backus repeatedly alleges

5  that any consumption of trans fats increases the risk of contracting various diseases. *E.g.*,

6  Compl. ¶ 17 ("any incremental increase in trans fatty acid intake increases the risk of

7  [coronary heart disease]."); *id.* ¶ 34 ("Eating trans fats increases your risk of developing

8  heart disease."); *id.* ¶ 78 ("consuming artificial trans fat in any quantity . . . increases the

9  risk of heart disease, diabetes, cancer, and death."). However, nowhere does Backus allege

10  that the amount of trans fats that he consumed after purchasing the baking mixes

11  approximately 20 times per year over the past four years was sufficient to *substantially*

12  increase his risk of the above diseases, or that, after such increased risk, the probability of

13  contracting the diseases was *substantial*. The failure to allege a substantially increased risk

14  based on the amounts he consumed would be fatal to his Complaint, if increased risk of

15  harm were his only alleged injury.

16  However, it is important to distinguish between the immediate physical injuries that

17  Backus alleges, which are sufficient to confer standing as discussed above, and the alleged

18  probabilistic future injuries, which are not. Backus alleges both that consuming any

19  amount of trans fats inflames and damages vital organs, and that it increases the risk of

20  coronary heart disease, diabetes and cancer. The former claim is sufficient for standing

21  because it alleges a present injury, even if the alleged injury may be minimal. The latter

22  claim fails, because Backus did not allege that the amounts he consumed caused a

23  substantial increase in the risk of contracting the diseases.

24

25  **II.   Backus Has Failed to State Two of His Claims for Relief**

26  Backus brings claims under the "unlawful" and "unfair" prongs of the UCL, the

27  public nuisance law, and the implied warranty of merchantability. He has plausibly stated

28  claims for just the first two of these causes of action.

13

1    "Dismissal can be based on the lack of a cognizable legal theory or the absence of

2    sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police*

3    *Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).

4    As discussed below, Backus has sufficiently identified the products at issue in this

5    case, and he has met the UCL's requirement of alleging that he was injured "as a result of"

6    General Mills' conduct.  Backus has stated claims for violations of the "unfair" and

7    "unlawful" prongs of the UCL, and therefore these claims are not dismissed.  However, he

8    has failed to state claims for public nuisance or for breach of the implied warranty of

9    merchantability, and these claims are therefore dismissed.

10

11   **a.  Backus has sufficiently identified the products at issue**

12   General Mills' first argument for dismissing the Complaint is that Backus has failed

13   to sufficiently identify which of its baking mixes he purchased.  Rule 12 Mot. at 10-11.

14   General Mills' argues that, due to this omission, the Complaint does not comply with

15   Federal Rule of Civil Procedure 8, because General Mills has not been given sufficient

16   notice to defend against the Complaint.

17   Rule 8 states that a complaint "must contain . . . a short and plan statement of the

18   claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under this

19   Rule, a complaint "must contain sufficient allegations of underlying facts to give fair

20   notice and to enable the opposing party to defend itself effectively."  *Starr v. Baca*, 652

21   F.3d 1202, 1216 (9th Cir. 2011).

22   Relatedly, under the class action mechanism, a named plaintiff may properly

23   include allegations in his complaint involving products that he did not purchase, so long as

24   those products are substantially similar to the products that allegedly caused his own

25   injuries.  *Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012)

26   (collecting cases).  The degree of similarity required depends on the nature of the claims

27   being litigated; for example, for claims regarding the ingredients of products, the products

28   must actually include substantially similar ingredients, but "[w]here product composition

United States District Court
Northern District of California

is less important, the cases turn on whether the alleged misrepresentations are sufficiently similar across product lines." *See id.*

Applying this rule in a case about the alleged mislabeling of evaporated cane juice in yogurt, the court found that, where the plaintiffs had specifically alleged purchases of certain flavors of yogurt based on the misrepresentations, but included claims involving additional flavors without additional factual allegations, that the plaintiffs had not pled the substantial similarity required to include those products in their complaint. *Kane v. Chobani, Inc.*, No. 12-cv-2425 LHK, 2013 WL 5289253, at *10-11 (N.D. Cal. Sept. 19, 2013). However, the court recognized that the plaintiffs "may be able to amend the complaint to address these deficiencies," and so it dismissed the claims regarding those products without prejudice. *Id.* at 11.

On the other hand, in a case about mislabeled ingredients in ice cream, the court found that the plaintiffs had sufficiently alleged substantial similarity where they were complaining about "the same kind of food products (*i.e.*, ice cream) as well as the same labels for all of the products—*i.e.*, 'All Natural Flavors' for the Dreyer's/Edy's products and 'All Natural Ice Cream' for the Haagen–Dazs products." *Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. 11-cv-2910 EMC, 2012 WL 2990766, at *13 (N.D. Cal. July 20, 2012). The court also held that "any concerns of [the defendant] and/or the Court about material differences are better addressed at the class certification stage rather than at the 12(b)(6) stage." *Id.*

Here, Backus alleges that "Defendants manufacture, distribute, and sell a variety of baking mix products (collectively "the Trans Baking Mixes" or "TF Baking Mixes") containing partially hydrogenated oil . . . ." Compl. ¶ 4. He alleges that "Plaintiff Troy Backus repeatedly purchased and consumed the Trans Fat Baking Mixes during the Class Period defined herein." *Id.* ¶ 5. He seeks to represent a class defined as "All persons who purchased in the United States, on or after January 1, 2008 (the "Class Period"), for household or personal use, boxed baking mix products manufactured or distributed by Defendants containing partially hydrogenated oil." *Id.* ¶ 83.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Backus is not bringing a misrepresentation claim.  *See id.* ¶¶ 92-123.  His

2  allegations go to whether it was lawful for General Mills to use trans fats in its baking

3  mixes in any amount.  *E.g.*, *id.* ¶ 101.  General Mills has sufficient notice of both the

4  products at issue (all of its baking mixes that included trans fat that were sold since

5  January of 2008) and the nature of the claims (selling products with trans fat violated the

6  UCL and the implied warranty of merchantability, and was a public nuisance).  The

7  products at issue are sufficiently similar for the pleading stage, because, by definition, all

8  of them contained trans fats.  *Id.* ¶ 83.

9    General Mills argues that Backus's failure to identify the products jeopardizes his

10  ability to represent a class.  Rule 12 Mot. at 10.  However, arguments about class

11  certification are premature so long as the defendant has been given fair notice of the

12  products at issue, which General Mills has here.  *See Astiana*, 2012 WL 2990766, at *13.

13    General Mills also argues that, if Backus were to identify precisely which baking

14  mixes he purchased, some of those mixes may turn out to be non-General Mills products,

15  allowing it to prepare a more effective defense.  Rule 12 Mot. at 11.  However, General

16  Mills does not dispute the fact that it sold baking mixes with trans fats.  Whether Backus

17  also purchased other companies' baking mixes is irrelevant to the question of whether he

18  has sufficiently pled a claim against General Mills, so long as Backus alleges that he

19  purchased General Mills' baking mixes, which he does.

20    Backus's allegations that he repeatedly purchased General Mills' trans fat baking

21  mixes, and his class definition including the purchasers of all such mixes since 2008, gives

22  General Mills fair notice to understand the nature of the claims and to prepare its defense.

23  The Complaint is sufficient under Rule 8.

24

25  **b.  The UCL does not have a heightened standing requirement in this case**

26    As discussed above, the UCL allows claims to be brought by "a person who has

27  suffered injury in fact and has lost money or property as a result of the unfair competition."

28  Cal. Bus. & Prof. Code § 17204.  General Mills next argues that this imposes a

1    "heightened" standing requirement to bring a claim under the UCL.  Rule 12 Mot. at 12-
2    13.

3            In fraud or misrepresentation cases, the "as a result of" requirement of the UCL
4    requires a plaintiff to allege that the defendant's misrepresentation was the "immediate
5    cause" of plaintiff's injury.  *Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1145
6    (N.D. Cal. 2013); *see also Cullen v. Netflix, Inc.*, No. 11-cv-1199 EJD, 2013 WL 140103,
7    at *4 (N.D. Cal. Jan. 10, 2013) ("Because Plaintiff's claims 'sound in fraud' he must plead
8    with particularity 'actual reliance' on the allegedly deceptive, fraudulent, or misleading
9    statements.").

10           However, as the California Supreme Court has made clear, the UCL's standing
11   limitations are intended "to eliminate standing for those who have not engaged in any
12   business dealings with would-be defendants . . . while preserving for actual victims of
13   deception and other acts of unfair competition the ability to sue and enjoin such practices."
14   *Kwikset*, 51 Cal. 4th at 317 (2011).  Accordingly, courts "need not torture the language of
15   the UCL . . . to conclude that harm in fact will meet the 'as a result of' requirement."
16   *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1138 (C.D. Cal. 2005).  Allegations
17   that a consumer was actually harmed by a business dealing with a defendant are therefore
18   generally sufficient in cases not involving fraud or misrepresentation.  *See id.*

19           Here, General Mills argues that Backus cannot satisfy the "heightened" standing
20   requirement because he cannot show that he suffered an injury as a result of General Mills'
21   conduct.  Rule 12 Mot. at 13.  However, as discussed above, Backus sufficiently alleged
22   that he suffered immediate physical injury by consuming General Mills' baking mixes in
23   the form of inflamed organs and economic injury by spending money on an illegal product.
24   This is sufficient to meet the "as a result" of standard under the UCL in this case.

25           General Mills also argues that Backus has not met the UCL's standing requirement
26   because he has not alleged that General Mills made any misleading statements or violated
27   any labeling regulations.  *Id.*  However, this is simply not a misrepresentation case; the
28   allegedly unfair business conduct here was the distribution of baking mixes with trans fats.

United States District Court
Northern District of California

1    *See* Compl. ¶¶ 92-123.  Because Backus is not arguing that General Mills violated any

2    labeling regulations, but instead is arguing that the distribution of the mixes was by itself

3    an unfair business practice, it is beside the point that Backus did not include

4    misrepresentation allegations in his Complaint.  As discussed below, Backus has plausibly

5    stated claims for relief under the UCL even though he does not allege any

6    misrepresentation.

7        Backus's claims do not sound in fraud, and the UCL does not carry a heightened

8    standard for standing in this case.  Backus's allegations regarding his immediate physical

9    and economic injuries are sufficient to confer standing for his UCL claims.

10

11   **c.  Backus has plausibly alleged an "unlawful" UCL claim**

12       The UCL prohibits "unfair competition," which is defined as "any unlawful, unfair

13   or fraudulent business act or practice and unfair, deceptive, untrue or misleading

14   advertising."  Cal. Bus. & Prof. Code § 17200.  Under the "unlawful" prong, "The UCL

15   'borrows violations of other laws and treats them as unlawful practices that the unfair

16   competition law makes independently actionable.'"  *Wilson v. Hewlett-Packard Co.*, 668

17   F.3d 1136, 1140 (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th.

18   163, 180 (1999)).

19       Backus argues that the sale of the baking mixes was unlawful under both federal

20   and state laws.  Although his federal authorities do not support his claim, he has plausibly

21   stated a claim that selling the baking mixes was unlawful under state law.

22

23       i.  Selling the baking mixes was not unlawful under federal law

24       Backus bases his federal law claims on the Food, Drug and Cosmetics Act

25   ("FDCA") and the regulations of the Food and Drug Administration ("FDA").  The FDCA

26   deems a food adulterated "if it bears or contains [] any food additive that is unsafe . . . ."

27   21 U.S.C. § 342(a)(2)(C).  Moreover, the FDA must grant pre-market approval to all food

28   additives.  *Id.* § 348(a).  However, the FDCA explicitly exempts from the definition of

"food additive" foods that are "generally recognized . . . as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe . . . ." *Id.* § 321(s).  This status is referred to as "Generally Recognized as Safe" or "GRAS."  21 C.F.R. § 170.30.

"General recognition of safety through experience based on common use in food prior to January 1, 1958, may be determined without the quantity or quality of scientific procedures required for approval of a food additive regulation."  *Id.* §170.30(c)(1).  Although the FDA maintains a list of foods that it has explicitly determined to be GRAS, the listed foods "do not include all substances that are generally recognized as safe for their intended use in food."  *Id.* § 170.30(d).  "Because of the large number of substances the intended use of which results or may reasonably be expected to result, directly or indirectly, in their becoming a component or otherwise affecting the characteristics of food, it is impracticable to list all such substances that are GRAS."  *Id.*

The partially hydrogenated vegetable oils at issue in this litigation are not listed among the foods that FDA has specifically determined to be GRAS.  *See* 21 C.F.R. Part 184.[4]  However, the FDA has noted that "PHOs . . . have been considered GRAS (through a GRAS self-determination) by the food industry for use in food at levels consistent with good manufacturing practice based on a history of use prior to 1958."  78 Fed. Reg. 67169-01, 67171 (Nov. 8, 2013).

On June 17 of this year, the FDA "made a final determination that there is no longer a consensus among qualified experts that partially hydrogenated oils . . . are generally recognized as safe (GRAS) for any use in human food."  80 Fed. Reg. 34650 (June 17, 2015).  The FDA determined that "PHOs are no longer GRAS by applying the GRAS standard to current scientific evidence and the views of qualified experts about the safety of PHOs."  *Id.* at 34657.

---

[4] Some other partially hydrogenated oils, including those from menhaden and rapeseed, are listed as GRAS in limited amounts.  *E.g.*, 21 C.F.R. §§ 184.1472, 184.1555.

United States District Court
Northern District of California

1    The FDA set a date for compliance with its determination three years out, on June

2    18, 2018.  *Id.* at 34651.  The FDA "encourage[d] submission of scientific evidence as part

3    of food additive petitions" to determine whether PHOs could be used in small amounts,

4    and set the compliance date in 2018 "to allow time for such petitions and their review."  *Id.*

5    at 34653.  The FDA found that "[t]he compliance date will have the additional benefit of

6    minimizing market disruptions by providing industry sufficient time to identify suitable

7    replacement ingredients for PHOs, to exhaust existing product inventories, and to

8    reformulate and modify labeling of affected products."  *Id.* at 34669.

9    Here, Backus has not stated a plausible claim that the sale of trans fat baking mixes

10   was unlawful under federal law.  Although the FDA never formally listed PHOs as GRAS,

11   it acknowledged that the food industry treated them as GRAS for decades.  Multiple

12   statements in the FDA's final order imply that PHOs were considered GRAS until the

13   order revoked that status, including statements such as "there is no longer a consensus,"

14   and "PHOs are no longer GRAS."  While these statements fall short of explicitly

15   recognizing that PHOs were once GRAS, they nonetheless strongly indicate that the FDA

16   treated PHOs as GRAS before publishing its order.

17   The FDA's decision to set a compliance date in 2018 is further evidence that PHOs

18   are not currently unlawful under federal law.  The FDA set the date three years out in order

19   to allow the industry to deplete its current product inventories, and to petition the FDA for

20   a determination that PHOs could be used as a food additive in small amounts.  FDA's

21   decision not to prohibit the sale of products containing PHOs until 2018 indicates that it

22   was not and is not unlawful under federal law to sell them before that time.

23   Both parties in this case overstate their arguments regarding the FDA's

24   determination.  Backus argues that PHOs have not been GRAS for a long time due to a

25   growing body of scientific research; while this argument parallels the FDA's reasoning in

26   its order, it ignores the FDA's recognition that it was changing the industry's

27   determination and its decision to set a compliance date in 2018.  On the other hand,

28   General Mills argues that "Prior to the June 17 Order, the FDA had permitted the use of

United States District Court
Northern District of California

1    PHOs and considered them GRAS for decades based on their consistent and common

2    usage." Primary Jurisdiction Mot. at 3. However, it does not appear that the FDA ever

3    formally recognized PHOs as GRAS; it merely acknowledged the *industry*'s determination

4    and has now permitted the industry to keep using PHOs until 2018.

5    Even though General Mills overstates its argument, it nonetheless has the better

6    view here. Backus has not plausibly alleged that the baking mixes were unlawful under

7    federal law, because they were widely treated as GRAS, at least by industry, until very

8    recently, and the FDA has permitted their continued use until 2018. Federal law, therefore,

9    cannot serve as the basis for his "unlawful" UCL claim.

10

11    ii.    Selling the baking mixes may have been unlawful under state law

12    Although Backus does not allege a plausible "unlawful" UCL claim based on

13    federal law, he plausibly states a claim under state law.

14    California's Sherman Act prohibits the sale of adulterated food. Cal. Health &

15    Safety Code § 110620. There are multiple definitions of what makes a food adulterated,

16    ranging from the broad to the very specific. Food is "adulterated if it bears or contains any

17    poisonous or deleterious substance that may render it injurious to [the] health of man . . . ."

18    *Id.* § 110545. Food is also "adulterated if it is, bears, or contains any food additive that is

19    unsafe . . . ." *Id.* § 110555.

20    In the Sherman Act, California adopted all of the federal food additive regulations

21    in effect as of November 23, 1970. *Id.* § 110085. California also adopts new federal food

22    regulations 30 days after the federal regulation takes effect. *Id.* § 110115.

23    Notably, in its final order on PHOs, the FDA stated the following with regard to the

24    preemptive effect of its order:

25                    There is no statutory provision in the FD&C Act providing for
                      express preemption of any state or local law prohibiting or
26                    limiting use of PHOs in food, including state or local
                      legislative requirements or common law duties. . . . We decline
27                    to take a position regarding the potential for implied
                      preemptive effect of this order on any specific state or local
28                    law; as such matters must be analyzed with respect to the

21

specific relationship between the state or local law and the federal law. FDA believes, however, that state or local laws that prohibit or limit use of PHOs in food are not likely to be in conflict with federal law, or to frustrate federal objectives.

80 Fed. Reg. at 34655.

In one of the few district court cases to address the interplay between the FDA rules and California's Sherman Act on this issue, the court held that "TFAs are 'generally regarded as safe'" and "GRAS substances are exempt from food additive status for the purpose of a food adulteration claim." *Simpson*, 989 F. Supp. 2d at 1025-26 (citing 21 U.S.C. § 321(s)(4); Cal. Health & Safety Code § 109940). However, the *Simpson* court's holding on this point is unpersuasive, for two reasons. First, the cited provisions state that a food is exempted if it is used with the "sanction or approval" of the FDA. 21 U.S.C. § 321(s)(4); Cal. Health & Safety Code § 109940. But here, there is no evidence that such formal sanction or approval was given to General Mills; instead, the industry self-determined that PHOs were GRAS. 80 Fed. Reg. at 34655; 78 Fed. Reg. at 67171.

The second reason that the *Simpson* court's holding is unpersuasive is that the court's assumption that PHOs are GRAS is no longer valid, because of the FDA's final determination. Regardless of whether a food that is GRAS can also be adulterated, the FDA has determined that PHOs are not GRAS, and it is now plausible that they would be found to be a "deleterious substance" that is "injurious to [the] health of man," such that their sale is prohibited by the Sherman Act.

Moreover, in a recent trans fat case in the Northern District, *Guttmann v. Nissin Foods (U.S.A.), Inc.*, No. 15-cv-567 WHA, 2015 WL 4309427 (N.D. Cal. July 15, 2015), the court rejected the argument that the lack of federal restrictions on trans fat foods somehow precluded parallel state law claims. *Id.* at *4. As the court in that case explained, "The FDA's prior declination to issue a regulation pertaining to all artificial trans-fats did not establish a safe harbor protecting use of that ingredient from the reach of California law." *Id.*

Here, General Mills argues that its sale of the baking mixes was not unlawful under state law because PHOs were GRAS at the federal level. Rule 12 Mot. at 18-19. This

22

argument fails, because, as both courts and the FDA have recognized, the FDA never formally sanctioned PHOs and the regulations do not preempt state laws that independently regulate the use of PHOs.

Backus has plausibly alleged that trans fats are an adulterated food under California's Sherman Act, because he plausibly alleges that they are injurious to health and there does not appear to be an applicable statutory or regulatory provision that otherwise exempts them from the Sherman Act. He has therefore plausibly alleged an "unlawful" claim under the UCL, and this cause of action will not be dismissed.

### d. Backus has plausibly alleged an "unfair" UCL claim

"California appellate courts disagree on how to define an 'unfair' act or practice in the context of a UCL consumer action." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010). Under the "FTC test," which is based on section 5 of the federal Fair Trade Commission Act, a plaintiff states a claim where the following criteria are met: "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Camacho v. Automobile Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006). Under the "balancing test," a plaintiff states a claim if he alleges that the harm to the public from the business practice is greater than the utility of the practice. *Rubio*, 613 F.3d at 1205. And under the "public policy" test, a plaintiff states a claim if he alleges that a practice "violates public policy as declared by 'specific constitutional, statutory or regulatory provisions.'" *Id.* (quoting *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 854 (2002)).

Although California appellate courts may be in disagreement, the Ninth Circuit has rejected the use of the FTC test in the consumer context, because the California Supreme Court discussion regarding that test "clearly revolves around anti-competitive conduct, rather than anti-consumer conduct." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718,

United States District Court
Northern District of California

1    736 (9th Cir. 2007) (citing *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20

2    Cal. 4th 163, 186 (1999)).

3         Courts are reluctant to grant motions to dismiss "unfair" UCL claims under the

4    balancing test, because the test involves weighing evidence that is not yet properly before

5    the court.  For example, in *Peterson v. Mazda Motor of Am., Inc.*, 44 F. Supp. 3d 965 (C.D.

6    Cal. 2014), the court refused to dismiss an "unfair" UCL claim on a Rule 12(b)(6) motion,

7    where the plaintiff had alleged that a car manufacturer had sold vehicles with a defect that

8    resulted in "catastrophic engine failure" and "a safety risk for drivers and passengers," and

9    where the automaker "ha[d] not made an argument about the utility of its conduct."  *Id.* at

10   973.  Taking the allegations as true, the court found that the harm to consumers could

11   plausibly outweigh the utility of the practice.  *Id.*

12        Here, as already discussed, Backus alleges a long list of negative health effects

13   related to the consumption of trans fats, including the inflammation of the vital organs and

14   increased risks of heart disease, diabetes, cancer, and death.  Compl. ¶¶ 15-60.  He also

15   alleges that "there are safe, low-cost, and commercially acceptable alternatives to artificial

16   trans fat, including those used in competing brands," but "Defendants unfairly elect *not* to

17   use those substitutes in the Trans Fat Baking Mixes in order to increase profit."  *Id.* ¶ 6.

18        General Mills' only response regarding the utility of using trans fats is that "[trans

19   fats] are included in Baking Mixes because they are lawful food ingredients."  Rule 12

20   Reply at 11 (Docket No. 13).  But this argument assumes the answer to the ultimate

21   question at issue in this litigation – whether trans fats are lawful ingredients.  Moreover,

22   this is not an independent argument for the utility of the practice; whether an ingredient is

23   lawful has nothing to do with whether it is useful to include it in a baking mix.  Unlawful

24   ingredients could still be useful, because they are cheap or delicious; lawful ingredients

25   could be useless, because they don't help to bake a cake.  Although a legislature or an

26   agency might consider an ingredient's utility in deciding whether to proscribe it, the two

27   principles are nonetheless orthogonal absent an independent reason for them to be aligned.

28

United States District Court
Northern District of California

1    Because Backus has alleged several harms related to trans fat use that could be

2  avoided in a cost-effective way, and because General Mills has not submitted a meritorious

3  argument regarding the utility of the practice, Backus has sufficiently alleged an "unfair"

4  UCL claim under the balancing test.

5    Backus has also alleged an "unfair" UCL claim under the public policy test.  To

6  identify the public policy that using trans fats allegedly violates, Backus points to

7  California's Sherman Law, which states that "It is unlawful for any person to manufacture,

8  sell, deliver, hold, or offer for sale any food that is adulterated."  Cal. Health & Safety

9  Code § 110620.  Food is "adulterated if it bears or contains any poisonous or deleterious

10  substance that may render it injurious to [the] health of man . . . ."  *Id.* § 110545.  For the

11  same reason that Backus sufficiently alleged that the sale of the baking mixes was

12  "unlawful" under the UCL, discussed in the preceding section, he has also sufficiently

13  alleged that their sale violated the Sherman Act's public policy of prohibiting the sale of

14  adulterated food.

15    For these reasons, Backus's "unfair" UCL claim will not be dismissed.

16

17  **e.  Backus has not plausibly alleged a public nuisance claim**

18    In addition to his UCL claims, Backus alleges that General Mills' sale of the baking

19  mixes constitutes a public nuisance under California law.  In California, a public nuisance

20  is "Anything which is injurious to health . . . so as to interfere with the comfortable

21  enjoyment of life or property . . . which affects at the same time an entire community or

22  neighborhood, or any considerable number of persons."  Cal. Civ. Code §§ 3479-80.  "A

23  private person may maintain an action for a public nuisance, if it is specially injurious to

24  himself, but not otherwise."  Cal. Civ. Code § 3493.

25    Under the requirement that a public nuisance be "specially injurious" to a plaintiff,

26  courts have recognized that "a plaintiff suing on this basis must show special injury to

27  himself of a character different in *kind* - not merely in degree - from that suffered by the

28  general public."  *Institoris v. City of Los Angeles*, 210 Cal. App. 3d 10, 20 (1989).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Multiple courts hearing trans fats challenges have found that the plaintiffs did not suffer injuries that were different in kind from those to the public generally.  In *Guttmann*, the court explained that "No decision applying California law has found that interference with the general public's right to a safe food supply by selling products with unhealthy ingredients constituted a public nuisance."  2015 WL 4309427, at *5.  The court noted that "The only injuries to the general public alleged herein are the risk of harm due to the consumption of artificial trans-fats and the cost of purchasing Nissin's noodle products," and found that "Guttmann has not alleged that he has suffered an injury different in kind from those injuries."  *Id.*  Because of the futility of amendment, the court dismissed the claim with prejudice.  *See id.* at *4-6.

In *Simpson*, the pizza case in the Southern District of California, the court found that "[trans fats] are not uniquely harmful to Plaintiff, but rather constitute a general health hazard to anyone who consumes them.  All consumers who have purchased the Contested Pizzas have 'lost money' by that act in the same manner that Plaintiff did."  989 F. Supp. 2d at 1025.

Backus argues that his alleged injuries here are different in kind than that of the general public, because his own injuries are "physical and emotional harm," and "lost money," whereas the harm to the public is a violation of its "right to a safe food supply" and its "interest in ensuring that only safe foods are allowed for sale."  Rule 12 Opp'n at 19.  However, these injuries are not distinguishable from Backus's own personal injury.  The public's interest in a safe food supply is only a more generalized version of Backus's own personal interest in eating safe food.

The Court agrees with the reasoning of the other courts to consider this issue, and finds that Backus has not alleged an injury that is different in kind from the injury to the general public.  Moreover, in accord with the reasoning of *Guttmann*, the Court finds that amendment of this cause of action would be futile.  Backus's public nuisance claim is therefore DISMISSED WITH PREJUDICE.

**f.  Backus has not plausibly alleged an implied warranty of merchantability claim**

Backus's final cause of action is for a violation of the implied warranty of merchantability.  In California, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Cal. Com. Code § 2314(1).  This includes a requirement that the goods "Are fit for the ordinary purposes for which such goods are used."  *Id.* § 2314(2)(c).  "To breach the implied warranty of merchantability, a product must lack 'even the most basic degree of fitness for ordinary use.'"  *Guttmann v. Nissin Foods (U.S.A.), Inc.*, No. 15-cv-567 WHA, Docket No. 59, at 4 (N.D. Cal. Aug. 14, 2015) (quoting *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 406 (2003)).

"When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him."  Cal. Com. Code § 2316.

Courts in food cases have held that a label that discloses the presence of an unhealthy ingredient precludes liability under the implied warranty of merchantability.  In *Simpson*, the court found that the pizzas' label indicating the presence of PHOs precluded the plaintiff's claim under section 2316.  989 F. Supp. 2d at 1026-27.  And in a very recent opinion in *Guttmann*, the court dismissed a breach of the implied warranty of merchantability claim under section 2316, where the plaintiff "could have easily discovered that defect by reading the ingredients, which undisputedly listed partially-hydrogenated oils."  *Guttmann*, Docket No. 59 at 4.  The court in *Guttmann* did not consider whether a "typical consumer" would understand the risks of trans fats, because the plaintiff in that case admitted in a deposition that he did understand those risks.  *Id.* at 4-5.

The FDA regulates how oils are labeled in foods, requiring that they "be declared by [their] specific common or usual name" and "if partially hydrogenated, the name shall include the term partially hydrogenated."  21 C.F.R. § 101.4.  Moreover, the National

27

Labeling and Education Act prohibits states from establishing food labeling requirements that are not identical to those required by the FDA.  21 U.S.C. § 341-1(a)(3).  "The phrase 'not identical to' means 'that the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food that are not imposed by or contained in the applicable federal regulation or differ from those specifically imposed by or contained in the applicable federal regulation.'"  *Lilly v. ConAgra Foods, Inc.*, 743 F.3d 662, 665 (9th Cir. 2014).

Here, Backus has not plausibly alleged that the baking mixes were unfit for even the most basic degree of ordinary use.  While the Complaint is full of citations to scientific studies discussing the dangers of increased ingestion of PHOs, notably absent are any allegations of the amount of PHOs present in a serving of foods made from General Mills baking mixes.  *See* Compl. ¶¶ 1-123.  Although the Court has found Backus's alleged immediate injuries to be sufficient for standing under Article III, where even an identifiable trifle is sufficient, these allegations do not state a plausible claim that the mixes were totally unfit for their intended use.

Additionally, as in *Simpson* and *Guttmann*, the presence of PHOs was clearly indicated on the baking mixes' labels.  Ex. A to Request for Judicial Notice.  A reasonable inspection would therefore have alerted Backus to the presence of PHOs in the baking mixes.  The Court recognizes that there is arguably a question of fact as to whether Backus could not reasonably be expected to understand the risks of partially hydrogenated vegetable oils.  However, such arguments go to the sufficiency of General Mills' warning, and as Backus admits in his opposition, "Plaintiff does not allege General Mills made any misleading label statements, nor does he make *any* allegations regarding its labeling or advertising."  Rule 12 Opp'n at 11 (internal quotation omitted).  Backus is therefore arguing that General Mills complied with all of its labeling obligations, while at the same time arguing that the risks of PHOs were not sufficiently disclosed to him.  This is a backdoor challenge to the sufficiency of General Mills' warning to Backus, which runs headfirst into the National Labeling and Education Act's express preemption of additional

1    food labeling requirements.  21 U.S.C. § 341-1(a)(3); *see also Taylor AG Indus. v. Pure-*

2    *Gro*, 54 F.3d 555, 563 (9th Cir. 1995) ("We hold that Appellants' implied warranty claims

3    are preempted by FIFRA because the asserted implied warranties operate by state law to

4    impose labeling requirements indirectly.").

5         *Reid v. Johnson & Johnson*, 780 F.3d 952 (9th Cir. 2015) is not to the contrary.  In

6    *Reid*, the court held that California state law misrepresentation claims about a food

7    company advertisement that stated that certain products had "No Trans Fat," when in fact

8    the products did contain trans fats, were not preempted by the National Labeling and

9    Education Act, because the advertisement was "an unauthorized nutrient content claim"

10   under the FDA's regulations and was "misleading in at least one respect," *i.e.*, that the

11   products claimed to have no trans fats when they did have some.  *Id.* at 962.  Here,

12   however, Backus is *not* arguing that General Mills' labels were misleading; rather, his

13   implied warranty claim functionally challenges the *sufficiency* of General Mills' labels.

14   This the National Labeling and Education Act does not let him do.

15        Backus has not stated a plausible claim under the implied warranty of

16   merchantability, because he has not plausibly alleged that the amounts of PHOs in General

17   Mills' products rendered them totally unfit for their intended use.  Moreover, General

18   Mills' compliance with its labeling obligations, including its disclosure of the ingredient

19   about which Backus complains, defeats Backus's claim for a violation of the implied

20   warranty of merchantability under section 2316 as a matter of law.  As amendment would

21   be futile under this cause of action, Backus's implied warranty of merchantability claim is

22   DISMISSED WITH PREJUDICE.

23

24   **III.   Backus's Remaining Claims Are Stayed Under the Primary Jurisdiction**

25          **Doctrine**

26        General Mills also argues that Backus's claims should be dismissed or stayed under

27   the primary jurisdiction doctrine.  Primary Jurisdiction Mot. at 6-10.  The primary

28   jurisdiction doctrine "is a prudential doctrine under which courts may, under appropriate

29

circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." *Syntek Semiconductor Co., Ltd. v. Microchip Tech., Inc.*, 307 F.3d 775, 780 (9th Cir. 2002).  The doctrine is useful where "a claim is cognizable in federal court but requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Id.* (quoting *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir.2002)).

When deciding whether to apply the primary jurisdiction doctrine, courts generally consider the following non-exclusive factors: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Syntek*, 307 F.3d at 781.

Here, consideration of the *Syntek* factors makes it clear that the question of whether the amounts of trans fats that were present in General Mills' baking mixes pose a significant safety risk to society is both an important question of first impression, and a complicated issue that has been committed to the FDA.

All four of the *Syntek* factors apply in this case.  First, there is a need to resolve an issue in this case, namely, whether the amounts of trans fats that were present in the baking mixes created a risk to public health that was not outweighed by their utility, and whether those amounts are dangerous enough to be considered an adulterated food.  Indeed, this remains an issue of first impression, as neither the courts nor the FDA have yet determined whether PHOs are unsafe in the amount present in the baking mixes.

Second, although the FDA does not have jurisdiction over these state law claims, Congress nonetheless granted the FDA authority to regulate food safety by requiring the pre-market approval of food additives and exempting foods that are generally recognized as safe.  *See* 21 U.S.C. §§ 342, 348.  If the FDA finds that small amounts of trans fats are permissible as a food additive, this will significantly undermine Backus's UCL claims.

1    Third, for the same reasons, it is clear that the FDCA subjects the food industry to

2    comprehensive regulation.

3              Fourth and finally, determinations of food ingredient safety require both specialized

4    expertise and uniformity in administration.  Backus's own Complaint includes dozens of

5    paragraphs discussing medical studies and their statistical results.  Compl. ¶¶ 11-60.

6    Whether a body of evidence sufficiently demonstrates that a particular amount of a

7    chemical substance poses a serious public health risk is precisely the kind of expert

8    question that agencies are better suited to answer than courts or juries.  Moreover, there is

9    a risk of conflicting judicial determinations for this question.  The *Simpson* court has

10   refused to entertain claims regarding trans fats in pizzas, while cases remain pending in

11   other courts.  The pendency of these other trans fat cases creates the risk that various

12   courts will find similar amounts of trans fats to either be lawful or unlawful ingredients.

13   Both the food industry and consumers will benefit from the uniformity that comes with an

14   agency determination.

15             Additional factors support applying the primary jurisdiction doctrine here.  The

16   FDA explicitly encouraged the food industry to submit petitions for review of trans fats as

17   a food additive, which General Mills has done, through its membership in the Grocery

18   Manufacturers Association.  Ex. 4 to Sipos Decl. at 1.  This is not a case where the FDA

19   has been silent on the question of whether it will resolve the issue; rather, the FDA set a

20   compliance date for its final order in June of 2018, in order for it to review food additive

21   petitions before that time.  80 Fed. Reg. at 34653.

22             Backus's remaining arguments against applying the primary jurisdiction doctrine

23   are unpersuasive.  Backus argues that the FDA has already resolved the question at issue

24   here by publishing its final order revoking the GRAS status of PHOs.  Primary Jurisdiction

25   Opp'n at 9-10 (Docket No. 24).  However, Backus conflates the notions of finding that

26   there is no longer consensus that something is safe, and actually finding that the thing is

27   unsafe.  *See* 80 Fed. Reg. at 34653 ("[W]e need not determine that there is a consensus that

28   low level uses are unsafe to find that PHOs are not GRAS at low levels; we need only

31

United States District Court
Northern District of California

1   determine that based on available scientific evidence there is not a consensus among

2   qualified experts that such uses are safe, as we do here.").  And while Backus

3   acknowledges that the FDA opened the door for food additive petitions, he argues that

4   such petitions face a "steeply uphill battle."  Primary Jurisdiction Opp'n at 14.  Yet, the

5   FDA "acknowledge[d] that scientific knowledge advances and evolves over time[, and]

6   encourage[d] submission of scientific evidence as part of food additive petitions . . . ."  80

7   Fed. Reg. at 34653.

8         Backus also argues that the FDA's jurisdiction is not "comprehensive," and that the

9   particular issues of state law here are properly resolved by the federal courts sitting in

10  diversity.  Primary Jurisdiction Opp'n at 11-12.  Backus is splitting hairs here.  While the

11  FDA may not have jurisdiction to determine if General Mills' sale of these baking mixes

12  violated California's Unfair Competition Law, the elements and arguments of that claim

13  are firmly rooted in the FDA's determinations regarding the safety of trans fats.  Indeed,

14  Backus's own briefing refers to FDA findings as evidence that the sale of trans fats is

15  "unlawful" or "unfair."  *E.g.*, Rule 12 Opp'n at 14 ("[I]n the face of . . . the FDA's plan to

16  ban partially hydrogenated oil . . . Defendants cannot seriously contend that Plaintiff's

17  alleged injury is so implausible that his claim should be dismissed at the pleading stage.");

18  *id.* at 18.

19        Backus also argues that the dangers of PHOs have been recognized by the Ninth

20  Circuit, precluding the application of the primary jurisdiction doctrine here.  However,

21  *Reid*, the Ninth Circuit case on which he relies, was a case about *misrepresentation*, not the

22  safety of PHOs.  780 F.3d at 955.  In that case, in finding that the primary jurisdiction

23  doctrine did not apply, the court noted that "there is no indication that the FDA is

24  contemplating authorizing 'No Trans Fat' statements," and that "[t]he issue that this case

25  ultimately turns on is whether a reasonable consumer would be misled by McNeil's

26  marketing, which the district courts have reasonably concluded they are competent to

27  address in similar cases."  *Id.* at 967.  Here, however, the FDA has explicitly invited food

28  additive petitions for PHOs; the Grocery Manufacturers Association has submitted such a

United States District Court
Northern District of California

1   petition; the FDA has indicated that it will rule on those petitions by 2018; and the case

2   ultimately turns on the safety of the ingredient, not whether a reasonable consumer would

3   be misled.  *Reid* therefore does not support Backus's argument.  Neither do the district

4   court cases that Backus cites for this proposition, all of which involved misrepresentation

5   claims rather than use claims.  *See, e.g.*, *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d

6   1111 (N.D. Cal. 2010); *Samet v. Procter & Gamble*, No. 12-cv-1891 PSG, 2013 WL

7   3124647 (N.D. Cal. June 18, 2013).

8          Whether small amounts of trans fats can lawfully be used as a food additive is a

9   complicated question requiring agency expertise, and one that the FDA will be reviewing

10  before June of 2018.  The Court finds that this question, which is central to Backus's

11  claims in this case, is therefore properly left to the FDA's determination under the primary

12  jurisdiction doctrine.

13         However, the Court will not dismiss the case under the primary jurisdiction

14  doctrine.  The Ninth Circuit very recently held that it is error to dismiss, rather than stay, a

15  case under the primary jurisdiction doctrine, where dismissal may cause a party to be

16  "unfairly disadvantaged" due to the potential application of the statute of limitations.

17  *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).  The statute of

18  limitations for Backus's UCL claims is four years.  Cal. Bus. & Prof. Code § 17208.  The

19  Court will therefore stay Backus's claim to avoid any potential prejudice from the

20  application of the statute of limitations.

21

22  **CONCLUSION**

23         For the reasons set forth above, the Court concludes that Backus has Article III

24  standing in this case, and he has stated claims under the "unlawful" and "unfair" prongs of

25  the UCL.  However, he has not stated claims for public nuisance or breach of the implied

26  warranty of merchantability, and these claims are DISMISSED WITH PREJUDICE.

27  General Mills' motion to dismiss for lack of subject matter jurisdiction and failure to state

28  a claim is therefore GRANTED IN PART and DENIED IN PART.  Furthermore, General

Mills' motion to dismiss or stay the case under the primary jurisdiction doctrine is GRANTED, and further litigation in this case is hereby STAYED pending the FDA's determination of the food additive status of PHOs.  No later than 14 days after the FDA's determination, the parties shall file a joint statement of no more than 15 pages setting forth their respective positions on the effect of the FDA's determination and recommending a further schedule for litigation in this case.

**IT IS SO ORDERED.**

Dated:   08/18/15

_____
THELTON E. HENDERSON
United States District Judge